# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

SIR-FRANK WILLIAM NELSON, III,

Defendant.

Case No. 21-cr-2024-CJW

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

**FILED UNDER SEAL**

_____

## TABLE OF CONTENTS

Page

**I.  INTRODUCTION**............................................................................2

**II.  FINDINGS OF FACT**....................................................................4

**III.  DISCUSSION**...........................................................................19

   **A.  The Parties' Positions**.........................................................19

   **B.  Whether Officers Had Reasonable Suspicion that Defendant was Armed and Dangerous**.................................................................20

      **1.  Warning Information**........................................................24

      **2.  Gang Affiliation**.............................................................24

      **3.  Area Known for Weapons Violations and Time of Night**..........27

      **4.  Proximity to Weapons Violation at Flirts**...........................29

1

5.      *Actions and Demeanor of Other Occupants of the Cadillac* ......**29**

6.      *Actions and Demeanor of Defendant* ...............................**30**

7.      *Evidence Related to Defendant's Criminal History* .................**33**

8.      *Open Bottle of Alcohol* ................................................**35**

9.      *Conclusion* .............................................................**36**

C.      *Whether Defendant Consented to the Pat Search* ..........................**37**

1.      *Defendant's Arguments* ................................................**37**

2.      *Analysis* ................................................................**40**

IV.     *CONCLUSION* .............................................................**52**

## I.      INTRODUCTION

On April 14, 2021, the Grand Jury charged Defendant Sir-Frank William Nelson, III with one count of Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(2).  (Doc. 2.)

The matter before the Court is Defendant's Motion to Suppress.  (Doc. 30.)  The Government timely filed a response.  (Doc. 38.)  Defendant timely filed a reply.  (Doc. 48.)  Both parties filed post-hearing briefs.  (Docs. 58, 59.)  The Honorable Charles J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Tuesday, March 29, 2022.  (Doc. 53.)

This motion arises from a June 28, 2020 incident in which City of Waterloo police officers were investigating a possible motor vehicle collision.  Defendant was a passenger in one of the vehicles involved.  When officers requested Defendant exit the vehicle, he was immediately subjected to a pat-down and a firearm was found on his person.  The

2

issues presented are (1) whether law enforcement had reasonable suspicion Defendant was armed and dangerous to justify the warrantless search of Defendant's person; and (2) whether Defendant consented to the search.

At the hearing, the following Government exhibits were admitted without objection:

1. Officer Amira Ehlers's Body Camera Video (Gov. Ex. 1A);

2. Officer Kristie Sommer's Body Camera Video (Gov. Ex. 1B);

3. Detective Keaton Northup's Body Camera Video (Gov. Ex. 2);

4. Waterloo Police Department ("WPD") Call for Service Record (Gov. Ex. 3);

5. Photo of front of Cadillac (Gov. Ex. 4);

6. Photo of driver-side wheel of Cadillac (Gov. Ex. 5);

7. Photo of street (Gov. Ex. 6);

8. Photo of gun (Gov. Ex. 7); and

9. Detective Jordan Ehlers's Body Camera Video (Gov. Ex. 8).

Defendant filed an Inventory of Items to be Suppressed. (Doc. 30-1.) Defendant's exhibits were admitted without objection:

1. Detective Keaton Northup's Body Camera Video (Def. Ex. A);

2. Officer Amira Ehlers's Body Camera Video (Def. Ex. B);

3. WPD Call for Service Record (Def. Ex. C);

4. Detective Jordan Ehlers's Body Camera Video (Def. Ex. D); and

5. Photos of Cadillac (8 pages) (Def. Ex. E).

The Government called three WPD officers as witnesses: Officer Amira Ehlers, Detective Jordan Ehlers, and Detective Keaton Northrup. Defendant called his sister, Miss-Sasha Nelson, to testify. I found all witnesses credible. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

3

## II.     FINDINGS OF FACT

The following findings were garnered from hearing testimony and the parties' exhibits.  Officer Amira Ehlers[1] ("Officer A. Ehlers") was on duty at approximately 1:40 a.m. in the area of Commercial Street and West Park Avenue in Waterloo, Iowa.  This downtown area was dark, but illuminated to some extent by streetlights that supply "plenty of artificial lighting in the area."  (A. Ehlers Hr'g Test. at 19.)[2]  Officer A. Ehlers and Officer Kristie Sommer were stopped near this area when they heard a large crash.[3]  Officer A. Ehlers looked up and saw a white Cadillac[4] and a black sedan next to one another, "almost kind of like touching each other."  (*Id.* at 7.)  Officers Sommer and A. Ehlers activated the lights on their patrol vehicle, parked near the site of the suspected collision, and exited the patrol car to approach the scene.  The black sedan had been traveling east on Commercial Street and the Cadillac traveling west on Commercial Street.  Because of the black sedan's turn signal, Officer A. Ehlers believed the black sedan was going to turn north.  It appeared to Officer A. Ehlers that the vehicles had collided close to their front tires.  With respect to the Cadillac, the point of the suspected collision was the front driver's side tire.

---

[1] Officer A. Ehlers is a graduate of the Iowa Law Enforcement Academy in 2019.  She had worked as police officer with the City of Hudson, Iowa for one year and then the City of Waterloo for two-and-a-half years.  She had been with the WPD for six months at the time of the incident described below.  All the law enforcement personnel discussed below were in police uniform at the time of the incident.

[2] All citations to hearing testimony are to the transcript of the March 29, 2022 suppression hearing.  (Doc. 54.)

[3] As Defendant points out, there may have been some doubt about whether the officers thought they needed to respond.  Officer Ehlers testified they did not "debate" investigation, but another body camera capture her statement, "We both literally watched the accident.  And then we stood there forever, and were like, 'We can't just leave.'"  (Gov. Ex. 2 at 2:04:18-2:04:28.)

[4] The parties used the terms "white sedan" and "white Cadillac."  I conclude both terms refer to the same vehicle and will refer to it simply as "the Cadillac."

4

After parking the patrol car to block traffic, Officer Sommer approached the driver of the Cadillac. Officer A. Ehlers approached the driver of the black sedan.[5] The driver of the black sedan said that "everything was fine" and drove away. The driver of the black sedan drove away before Officer A. Ehlers had finished her conversation with its driver. In fact, the black sedan drove off before Officer A. Ehlers could perform basic investigative functions such as obtaining the driver's identification and insurance information. Officer A. Ehlers radioed other officers to check the area for the black sedan in case the driver of the Cadillac wanted to pursue charges or seek damages for the collision.[6] The driver of the Cadillac did not attempt to drive away from the scene. There was no violence, gunfire, or even cursing among the occupants of the two vehicles. Although the exchange was not recorded, Officer Ehlers testified that she heard Officer Sommer speaking with the driver of the Cadillac. The driver of the Cadillac reported that he had spoken with the driver of the black sedan, told him to pay attention to the lights, and that "everything was all good." (*Id.* at 37-38.)

Officer A. Ehlers noticed the Cadillac appeared to evidence two violations of Iowa Code Chapter 321 regarding the operation of motor vehicles. Officer A. Ehlers noticed the Cadillac did not have a front license plate in violation of Iowa Code Section 321.37 and had excessive tinting of its windows in violation of Iowa Code Section 321.438. Officer A. Ehlers or Officer Sommer checked the Cadillac's vehicle registration number and determined it was not stolen. Officer A. Ehlers did not believe that Mr. Echols, the driver of the Cadillac, had disobeyed any traffic control device or suspect he was under

---

[5] At one point, Officer A. Ehlers referred to the black sedan as "the Cadillac." (A. Ehlers Hr'g Test. at 8.) I conclude from the context she merely misspoke and intended to describe her interaction with the black sedan.

[6] Officer A. Ehlers put this somewhat less formally when she said she wanted to "make sure [the driver of the Cadillac] wanted nothing done." (*Id.* at 9.)

Case 6:21-cr-02024-CJW-MAR    Document 60    Filed 05/03/22    Page 5 of 52

the influence of alcohol. (*Id.* at 20-21.) It was determined, however, that Mr. Echols did not have a valid driver's license.

As Officers Sommer and A. Ehlers approached the Cadillac they smelled "a strong odor that was consistent with an alcoholic beverage." (*Id.* at 9.) Officer A. Ehlers testified that they ultimately identified Rodonus Echols as the driver of the Cadillac, Defendant as the front-seat passenger, and Montavis Keller as the back-seat passenger. Officer A. Ehlers read these names to the police dispatcher ("dispatch") to determine if the driver had a valid license and to determine if any of the occupants had active arrest warrants. Neither Officer recognized any of the occupants; however, Officer Sommer was aware of recent intelligence that Mr. Echols was known to carry weapons and she shared this information with Officer A. Ehlers. (*Id.* at 11.) Officer Sommer did not share information about the other occupants of the Cadillac with Officer A. Ehlers.

Mr. Echols, the driver of the Cadillac, told officers no collision had occurred and he did not want officers to pursue the other driver or take further action. Officer A. Ehlers found this response unusual because in other "hit-and-run" accidents the person at the scene wants law enforcement to look for the driver who caused the damage. (*Id.* at 11-12.)

During this interaction, Officer A. Ehlers noticed what she believed was an open container of alcohol in the vehicle in violation of Iowa Code Section 321.284. She saw a container of Patrón (also identified as tequila) on the floorboard behind the driver's seat. She believed it was an open container of alcohol because of the smell of alcohol and because the bottle did not appear to be full. Officer A. Ehlers testified that when she encounters a possible open container violation, she typically removes all occupants from the vehicle to search it for other open containers. (*Id.* at 13.) At this point, Defendant was not free to leave the scene because of the suspected open container violation. Thus, Defendant was seized because of the open container and car accident investigation, but

6

not because officers considered him armed and dangerous. (*Id.* at 31-32.) Officer A. Ehlers had no information that led her to believe Defendant was armed and dangerous. She had not observed any of the Cadillac's occupants try to hide their hands, fidget, or make suspicious movements. (*Id.* at 32, 34.)

At some point during the encounter with law enforcement, Detectives Jordan Ehlers[7] and Keaton Northup of the WPD's Violent Crimes Apprehension Team ("VCAT")[8] were nearby, heard about the encounter on the radio, and drove to the scene. VCAT's assistance was not requested by Officer A. Ehlers. She noticed nothing violent about the car accident and she did not know why they arrived.[9] (*Id.* at 26.) Officer A. Ehlers estimates they arrived within three to five minutes[10] of her initiating conversation

---

[7] Detective Ehlers became a certified peace officer in 2012. He was an officer with the La Porte City Police Department for four years and has been an officer with the WPD for six years.

[8] VCAT investigates "gun violence, gang violence, illegal firearm possession, and firearm trafficking." (Det. Ehlers Hr'g Test. at 46.)

[9] On this subject, it should be noted, as Defendant did in his post-hearing brief, that the VCAT officers "took over" the investigation and did not act as backup. (Doc. 58 at 2.) Moreover, there appeared to be relatively little investigation of the collision by the VCAT officers. (*Id.* at 2-3.) To the extent Defendant concludes there is anything suspicious about this switch, I respectfully disagree. Based on the information known to the VCAT officers, as more particularly discussed below, having more experienced officers with additional training interact with occupants of the Cadillac appears nothing more than appropriately cautious.

[10] On cross-examination, Defendant called attention to the fact that Officer A. Ehlers's body camera did not record the first several minutes of her interaction at the scene. Officer A. Ehlers's explanation suggests that she intended to activate her body camera but did not effectively do so when she exited her vehicle. She testified that she turned it on when she noticed the green light was not on. (A. Ehlers Hr'g Test. at 17.) She then turned on the camera. (*Id.*) Approximately seven to eight minutes of the interaction were not recorded, if the time dispatch opened the call was synched with the clock on the body camera. (*Id.* at 14.) The initial interaction between the occupants of the Cadillac and Officer Sommer are also not available, although no explanation was offered for this missing footage. Defendant is justifiably suspicious about the absence of part of the interaction with the occupants of the vehicles on both cameras. Nevertheless, Defendant offers no basis to make any sort of adverse inference about the loss. Officer A. Ehlers testified regarding the persistent technical difficulties posed by the body cameras then in use. (*Id.* at 18-19.) Moreover, the most important part of the encounter leading up to the pat-down of Defendant was preserved on video.

with "the driver," Mr. Echols. (*Id.* at 13.) The members of VCAT, principally in the person of Detective Ehlers, took over the investigation when they arrived. (*Id.* at 27; Gov. Ex. 1A (A. Ehlers's Body Camera Video); Def. Ex. D (Det. Ehlers's Body Camera Video).) Once the VCAT officers arrived, there were six officers on scene for the remainder of the encounter. Detective Ehlers and Officers Sommers and A. Ehlers were on the driver's side of the vehicle; Detective Northrup and two unidentified WPD officers were on the passenger side of the vehicle. (Gov. Ex. 1A.)

Prior to arriving at the scene described above, Detectives Ehlers and Northup had responded to a 1:36 a.m. call for service at Flirts Gentlemen's Club ("Flirts") approximately two blocks away. Someone had reported a black man outside of Flirts in a black SUV waving an AR-15. While investigating the call at Flirts, Detective Northup learned from police radio that other officers were performing warrant and driver's license checks for Rodonus Echols and Defendant and shared this information with Detective Ehlers.

Detective Ehlers recognized Mr. Echols from prior weapons and narcotics investigations and knew Mr. Echols was on probation for a federal firearms offense. Detective Ehlers testified he knew Mr. Echols was a member of A1/Front Street, a "local hybrid criminal gang in the Waterloo, Iowa area." (Det. Ehlers Hr'g Test. at 49.) Detective Ehlers testified that this street gang is responsible for drug distribution and weapons-related offenses, including shootings. (*Id.*) Detective Ehlers knew Mr. Echols has an "A" and a "1" tattooed on the front of his neck. (*Id.*)

Detective Ehlers knew Defendant had a previous federal conviction involving firearms sometime between 2014 and 2016. (*Id.* at 53.) He also knew Defendant had been arrested "a minimum of five times," which does not include arrests for probation or parole violations. (*Id.* at 63.) In addition, Detective Ehlers knew Defendant was a member of A1/Front Street. (*Id.* at 50.) In May 2020, Defendant posted a hip-hop or

rap music video on YouTube entitled "A1 Anthem." The video depicted Defendant and other members or associates of A1 on Logan Avenue in Waterloo. (*Id.*) The video makes multiple references to possessing a "chopper," which Detective Ehlers interprets as a firearm. (*Id.* at 69.) No ammunition, firearms, or bulges consistent with firearms are seen in the video. (*Id.* at 70.) Detective Ehlers acknowledged that references to firearms are very common in rap songs. (*Id.* at 71.) About this same time, Detective Ehlers was aware of a feud or "feuding" involving the A1/Front Street gang, but no particular information that Defendant possessed firearms at that time. (*Id.* at 70-72.)

Defendant's name appears in the WPD's booking information along with a warning for "carrying weapons." (*Id.* at 50.) It is unclear if this warning was created solely because of Defendant's prior firearms conviction. Detective Ehlers testified it could have been created at the time of any of Defendant's prior arrests. (*Id.* at 51.)

The most recent "hard evidence" of Defendant's involvement with firearms known to Detective Ehlers at the time of the stop was from January 2017. (*Id.* at 72.) Detective Ehlers was aware of prior incidents at the residences where Defendant lived with his family. On January 1, 2017, Detective Ehlers was patrolling nearby when a "firefight" broke out and individuals on the porch of the house where Defendant resided were shooting at the residence across the street. (*Id.* at 51-52.) Detective Ehlers was unable to identify Defendant as a person involved. (*Id.* at 52.) A second shooting incident happened on January 18, 2017. (*Id.*) Gunshots were reported to have been fired at Defendant's residence, but there was no basis to believe Defendant would have fired these shots. (*Id.*) The residence was searched but no firearms were found. (*Id.* at 74.) Defendant was present at the scene and admitted living there. (*Id.* at 89.) Defendant was not arrested in connection with either incident.

Detective Ehlers also had some information about Defendant's possible involvement with a firearm in September 2018. Defendant was listed as a possible

suspect in the homicide investigation arising from this incident. Defendant was among the occupants of a vehicle from which a firearm was thrown. (*Id.* at 91.) At the time Detective Ehlers approached the Cadillac on June 28, 2020, results of DNA tests on that firearm that eventually implicated Defendant, among others,[11] were not yet available. (*Id.* at 77.) However, Detective Ehlers knew there was enough evidence to support a search warrant for a DNA test. (*Id.* at 79.) Detective Ehlers did not know if the vehicle from which the firearm was thrown had been at the scene of the homicide. (*Id.* at 92.)

Detective Ehlers considered the area of Flirts to be a high-crime area for assaults and weapons violations. (*Id.* at 54.) It is unclear if he considers the part of downtown where the Cadillac was encountered to be part of this same high-crime area, although it is within a few blocks. Based on their knowledge of Mr. Echols's and Defendant's history, Detective Ehlers thought it was possible they had been involved in the Flirts weapons call. (*Id.* at 55.) The occupants of the Cadillac met the very limited description available; that is, like the subject of the incident at Flirts, black men.[12] Additionally, Detective Ehlers had no information suggesting that the Cadillac or Defendant had been at Flirts or in a black SUV, such as the one reported at Flirts.

When Detectives Ehlers and Northrup arrived on scene, Detective Ehlers parked directly in front of the Cadillac and observed Mr. Echols in the driver's seat, Defendant in the front passenger seat, and a passenger in back. Detective Ehlers testified that multiple occupants of a car pose a greater safety concern due to the need to watch more people. (*Id.* at 100.) Detective Ehlers approached the driver's side of the Cadillac and Detective Northrup approached the passenger's side of the Cadillac.

---

[11] Detective Ehlers testified that he "was aware that [Defendant's] DNA was one of the profiles in question on that firearm." (Det. Ehlers Hr'g Test. at 77.)

[12] Law enforcement only learned later that the Flirts subject had long dreadlocks. (*Id.* at 88-89.) None of the occupants of the Cadillac had long dreadlocks.

As he approached the driver, Detective Ehlers smelled a strong odor of an alcoholic beverage. (*Id.* at 57.) He also observed Mr. Echols's demeanor change, as he approached, from "lighthearted" to "nervous." (*Id.* at 57-58.) However, Detective Ehlers used a smiling, friendly, and joking demeanor in his interactions with the passengers. (*Id.* at 83.) He never felt so threatened that he ordered Mr. Echols to put his hands on the wheel or ordered him to get back in the Cadillac when he put his head out of the window to view tire damage the Cadillac had sustained in the accident. (*Id.* at 82; Def. Ex. 2 at 1:50:02.)

Detective Ehlers noticed damage to the driver's side wheel well and wheel. (Def. Ex. 2 at 1:49:49-1:50:05.) He believed the tire was losing air and tried to confirm this by looking for a "low tire" light on the dashboard of the Cadillac. (*Id.* at 1:50:05-19.) Mr. Echols stated, "I don't see it yet," when he and Detective Ehlers looked at the dashboard. (*Id.* at 1:50:08-20.) Although it appears from Detective Ehlers's body camera video that some dashboard warning lights were on, it is unclear what the lights represent. (*Id.* at 1:58:17-23.) In the video, no one confirmed that the low tire light was on.

Mr. Echols first denied there had been contact with the other vehicle. He clapped his hands and stated that "the dude, he didn't really hit the car," but that they "kinda stopped at the same time." (*Id.* at 1:54-58.) However, Mr. Echols appeared to accept at least the possibility he was hit after Detective Ehlers pointed out the damage to the Cadillac. Detective Ehlers interpreted Mr. Echols's attempt to dismiss his collision as an effort to bypass interaction with law enforcement. (Det. Ehlers Hr'g Test. at 59.)

Detective Ehlers then advised Mr. Echols that he needed him to step out of the car to make sure he had not been drinking and because the smell of alcohol and the open container gave law enforcement probable cause to search the vehicle. (Def. Ex. 2 at 1:50:54-1:51:05.) Mr. Echols handed the Patrón bottle to Detective Ehlers. (*Id.* at 1:51-

11

05.) The presence of alcohol made Detective Ehlers concerned the occupants could be intoxicated and unpredictable. (Det. Ehlers Hr'g Test. at 61.) When Mr. Echols stepped out of the Cadillac, he immediately raised his hands and allowed Detective Ehlers to pat search him. (Def. Ex. 2 at 1:51:21-27.) Detective Ehlers authored a report on his role in this encounter.[13] (Det. Ehlers Hr'g Test. at 84.) In his report, Detective Ehlers did not refer to Mr. Echols giving consent to the search. At the hearing, Detective Ehlers agreed that Mr. Echols was "simply submitting to [his] authority." (*Id.* at 88.) He also testified that Mr. Echols, when asked to step out of the vehicle stayed seated and looked forward with a "thousand-yard stare." (*Id.* at 61.) This behavior was a "major concern" to Detective Ehlers because it was consistent with someone who had knowledge that contraband would be discovered in the vehicle and was considering whether to conceal it or prevent law enforcement from entering. (*Id.* at 62.) A bag of suspected K-2, synthetic marijuana, was found in the driver-side door; a second open bottle of alcohol was also located in the Cadillac; and suspected ecstasy was found on Mr. Echols's person.

Detective Ehlers testified that throughout his encounter with the occupants of the Cadillac, he observed Defendant turning in the front passenger seat to look around and he interpreted this as a sign of nervousness and an indication that he might be considering concealing an item or fleeing from the vehicle. (*Id.* at 59-60; Def. Ex. 2 at 1:49:31-43.)

Detective Northup[14] testified that when he heard Mr. Echols's and Defendant's names on the radio, he was also already familiar with them. He knew Mr. Echols was

---

[13] His report is dated more than five months after the incident despite the "soft guideline" of the WPD that reports are unreasonably late more than a month or two after an incident.[13] (Det. Ehlers Hr'g Test. at 85.) Detective Ehlers speculated that he may have drafted the report earlier but only uploaded it to "TraCS" on December 1, 2020, which might explain the delay. (*Id.* at 86.) This report is not in evidence.

[14] Detective Northup is a 2014 Iowa Law Enforcement Academy graduate. He had been a police officer with the City of Albia and has been a patrol officer with the WPD since 2016. He is currently assigned as a detective with VCAT.

12

on probation following a federal weapons conviction and considered him a member of the A1/Front Steet gang that had been responsible for multiple shootings and narcotics. (Northrup Hr'g Test. at 95-96.) Detective Northrup also believed Defendant was "an associate with the A1/Front Street."[15] (*Id.* at 96.) Detective Northup testified that he was aware of a warning that came with information about Defendant for carrying weapons and resisting arrest, but he did not know how old those warnings were or how long they remain on a person's record. (*Id.* at 97.) Detective Northup believed these warnings arose because Defendant has been a suspect in several shootings, but he did not have details about the shootings, such as when they occurred. He also knew that Defendant's residence was "shot up multiple times." (*Id.* at 96-97.) Detective Northup had no significant detail surrounding the shootings at the residence. He also knew "vaguely" about an assault or shooting that may have involved Defendant from September 10, 2018. (*Id.* at 98.)

When he approached the Cadillac, Detective Northup apparently recognized Mr. Echols and Defendant (or at least knew they had been so identified). (*Id.* at 99.) In contrast, he did not know who the rear passenger was at the time. (*Id.*) Detective Northup was concerned that the "traffic incident" could be related to the incident at Flirts because of its proximity and the fact that the subject of the Flirts call was a black man. (*Id.* at 99-100.) Like Detective Ehlers, Detective Northup was concerned about the greater safety issues posed by multiple occupants of the vehicle. (*Id.* at 100.) He

---

[15] There was no testimony regarding the difference, if any, between a member and an associate of a street gang. It seems somewhat plausible that the terms were used interchangeably, however, my impression is that a member is more deeply and perhaps more formally involved in the gang than someone who merely associates with it. In addition, gangs are likely not inclined to publish their rosters for obvious reasons. Thus, law enforcement's testimony regarding gang membership is often, as it was in this case, couched in terms of an officer's opinion.

13

described the area where the Cadillac was encountered as a "very high-crime" area[16] where law enforcement encounters multiple weapons violations. (*Id.* at 99.) He described the lighting as "dim" despite the presence of streetlights. (*Id.*)

Detective Northup approached the passenger side of the Cadillac and observed excessive window tint that required him to use his flashlight to see inside. (*Id.* at 101.) The rear passenger, Mr. Keller, seemed nervous as Detective Northup could see his stomach "going in and out very quickly." (*Id.*) Detective Northrup saw Mr. Keller make furtive movements "digging" down by the floorboard and he was eventually told by another officer to stop. (*Id.* at 102-03.) Meanwhile, Detective Northrup saw Defendant turn his head "almost 180 degrees," which Detective Northup interpreted as looking to see where officers were located, possibly to find an escape route. (*Id.* at 101-02; Def. Ex. 2 at 1:49:31-43.)

Detective Northup was standing on the curb approximately two feet from the car and looking in at Defendant through tinted windows with his flashlight. (*Id.* at 116, 118.) Detective Northup did not see Defendant reach toward his waistband, hide his hands, shift his weight, or fidget. (*Id.* at 116-17.) Mr. Echols started to step out of the car at 1:51:20 a.m. as seen on Detective Northup's body camera video.[17] Detective Northrup

---

[16] Detective Northup did not know what certain specifics might qualify the area as "high crime," such as the most recent homicide or weapons violation proceeding the June 28, 2020 encounter. However, he stated, "We have multiple on the weekends and throughout the week in the downtown area." (Northrup Hr'g Test. at 114.) This implies, at the very least, that weapons violations are somewhat routine in the area.

[17] This time is registered from the "Media Time" in the lower left-hand corner of the recording. The "Media Times" are not synched between different officers' body cameras. For example, on Detective Northrup's body camera video, it appears that Defendant exits the Cadillac and turns around at 1:51:30-32 a.m. (Gov. Ex. 2.) Although the view is different and therefore the exact moment of Defendant leaving the vehicle may not be caught on Officer A. Ehlers's video, her body camera video appears to capture this moment at 1:52:06 a.m. (Gov. Ex. 1A.) Officer A. Ehlers testified that officers' cameras "with dispatch sync differently with the times," which may account for the discrepancy. (A. Ehlers's Hr'g Test. at 15.)

asked Defendant, "Nelson, will you step out, man?" the car at 1:51:26 a.m. (*Id.* at 1:51:26.) It is not clear from the Detective Northup's video whether Defendant could see Mr. Echols raise his hands for the search by Detective Ehlers; however, it appears Defendant's attention was focused on Detective Northup as Mr. Echols exited the car and immediately turned his back and raised his hands at 1:51:30-32 a.m. (*Id.* at 1:51:30-32.)

On cross examination, Detective Northrup testified that Defendant stepped out of the car into the "well of the passenger side door."[18] (Northrup Hr'g Test. at 118.) Detective Northup stepped back to allow the front passenger door to open and then stepped back into the well of the door. (*Id.*) At his point, Defendant was inches from the vehicle, Detective Northup was within a "foot or two" of Defendant's person, and Defendant was not free to leave. (*Id.* at 118-19.) By this juncture, Detective Northup had determined to perform a pat-down for officer safety reasons. (*Id.* at 120.) Detective Northup testified that Defendant "exited the car, turned and faced the vehicle, facing away from me, and raised his arms willingly." (*Id.* at 103.) Detective Northup interpreted Defendant's actions in turning and raising his hands as him volunteering for the pat search. (*Id.*) Defendant conducted the pat-down as he was trained and as is typical in his department, that is, with the subject of the search facing away from him. (*Id.* at 123.)

Detective Northup asked twice whether Defendant "had anything on him." Defendant made no response to the first inquiry, but the second time he stated no. (Gov. Ex. 2 at 1:51:32-48; Northrup Hr'g Test. at 103-04.) The failure to respond the first time "raised a caution" for Detective Northup. (Northrup Hr'g Test. at 104.) From his body camera video, it appears that Detective Northup began asking Defendant if he had

---

[18] I take "well of the door" to mean the circular sector immediately outside the front passenger door bounded on one side by the door itself, on the second side by the body of the car, and on the third side by the arc traveled by the door a point farthest from its hinge.

anything on him while he commenced the pat-down. (Gov. Ex. 2 at 1:51:32.)  After the pat-down (a seconds-long pat on the outside of the pockets), Detective Northup asked Defendant what was in his right front pocket.  (*Id.* at 1:51:49; Northrup Hr'g Test. at 104.)  When Defendant said he did not know, Detective Northup asked permission to grab the item and Defendant said, "Go ahead."  (Gov. Ex. 2 at 1:51:58; Northrup Hr'g Test. at 104.)  Detective Northup had noticed that Defendant's belt was excessively tight and, continuing the pat-down, he felt what he thought was a firearm to the right of Defendant's belt buckle.  (Northrup Hr'g Test. at 105.)

Defendant was then detained.  With the assistance of another officer to uncinch Defendant's belt buckle, Detective Northup was ultimately able to remove a firearm that was later determined to be a stolen, loaded .40-caliber Smith & Wesson.  (*Id.* at 106-07.)

Detective Northup never instructed Defendant to turn around or raise his arms. Detective Northrup did not ask permission to search Defendant.  Detective Northup testified he did not state that Defendant consented to the pat-down in either of the two reports he authored.  (*Id.* at 116.)

Mr. Keller, who was seated on passenger side in backseat was also asked to exit the vehicle.  According to Officer A. Ehlers's body camera, Mr. Keller exited the Cadillac at 1:52:04 a.m., about two seconds before Defendant exited the vehicle  (Gov. Ex. 1A at 1:52:04.)  Unlike Defendant, Mr. Keller did not immediately turn and hold up his arms to be searched.  Rather, he looked toward Defendant, then put his hands behind his back, and finally turned and held up his arms, all while apparently listening to questions and/or instructions from a WPD officer.  (*Id.* at 1:52:05-11.)  Therefore, it appears Defendant and Mr. Keller were pat searched at about the same time.  (*Id.* at 1:52:09.)  After being pat searched, Mr. Keller was detained for a short time, but was released at the scene.

Defendant called his older sister, Miss-Sasha Nelson to testify. Ms. Nelson was called to provide background information about Defendant and his experiences with police officers. [19] Ms. Nelson and Defendant grew up together and were raised by their father, Frank Nelson, Jr. Ms. Nelson testified, in essence, that their father had taught them to avoid conflict with police by not only complying with their authority but also by anticipating what the police wanted and acting accordingly. Ms. Nelson testified that they we brought up to fear contact with the police. (Nelson Hr'g Test. at 128-29.) Ms. Nelson testified that police "do what they want to do," so it is better to "give them what they want" out of fear of what might happen. (*Id.* at 130.)

Ms. Nelson testified about Defendant's earliest encounter with law enforcement when he was younger than ten-years-old. (*Id.* at 131.) Ms. Nelson described other neighborhood children stealing from a store and law enforcement wrongly accusing Defendant of the theft. Defendant, according to Ms. Nelson, went along with the police out of fear and did not defend himself against the allegations, although he was later released. (*Id.*) This incident, while remote in time, was offered as an example of Defendant's tendency to do what he thought law enforcement wanted or expected from him. (*Id.* at 132.)

---

[19] I have included Ms. Nelson's description of these formative incidents in Defendant's life in this section called "Findings of Fact." I have no reason to doubt Ms. Nelson other than, perhaps, the possible inclination anyone might have to testify favorably on behalf a loved one. On the other hand, the facts relayed by Ms. Nelson are qualitatively different from, for example, the facts surrounding the pat-down of Defendant. First of all, most of these incidents are remote in time and are not corroborated by video or other evidence. Second, the officers who may have interacted with Defendant as a child were not identified and were not called to testify on these issues. I do not mean to suggest that either party should have attempted to pursue these issues further. Thus, I consider the facts related by Ms. Nelson about Defendant's history for the purpose of assessing their possible impact on Defendant and not as conclusive of any particular behavior by the WPD.

Ms. Nelson also testified regarding an incident before Defendant turned 18 when law enforcement saw Defendant and a different sister having an argument in their front yard. (*Id.* at 132-33.) Ms. Nelson reported that the police immediately handcuffed them and took them to jail despite their mother's pleas about the nature of the dispute. (*Id.* 133.) This incident might have been offered to show Defendant's compliance with authority; however, Ms. Nelson's description evolved somewhat into a narrative about how law enforcement seemed to pick on Defendant and/or act unprofessionally. She testified:

> Q. And when this happened, did Sir-Frank try and tell the police, "You don't know what you are doing. I didn't do anything wrong"?
> A. Yeah, it is -- he had -- and the cops would jump straight out the car and they would just, like, run across the yard, and they had snatched him up and put him in handcuffs and put him in the back of the car, and that's when my mom was trying to plead that things wasn't what they may seem. And they yelled for her and us to get away from the car or everybody was going to go to jail. And later on, as, like, they would go to court or whatever, that's when they -- that he got a chance to say that that was his sibling and not an altercation.

(*Id.*) Ms. Nelson testified that she thought the police were more aware of Defendant after his release from prison following his federal firearms conviction. (*Id.* at 134.) She testified that police followed or stopped the vehicle Defendant was in without reason, but that Defendant was cooperative during these stops to avoid any danger. (*Id.* at 135-36.)

Ms. Nelson further testified that after Defendant was shot in the front yard of their house, law enforcement did not believe him when he denied knowing the identity of the shooter and they were not "understanding" when he could not give them what they wanted. (*Id.* at 136-37.) After the family residence was shot up (on what Ms. Nelson described as numerous occasions), Ms. Nelson was critical of the interaction with law enforcement. (*Id.* at 137-38.) When called into the residence to investigate the shootings, Ms. Nelson testified that law enforcement would focus on Defendant's possible role in

the shootings. (*Id.*) Ms. Nelson expressed her opinion that the police did not follow "proper protocol" during these investigations.[20] (*Id.* at 138.) These experiences, in Ms. Nelson's opinion, have led Defendant to believe (1) he is not free to do what he wants; (2) the Waterloo police are free to do what they want; and (3) he should just do what he thinks the police want him to do. (*Id.* at 138-39.)

On cross-examination, Ms. Nelson testified that she was not aware that Defendant may not have always been compliant with police. (*Id.* at 140.) She was unaware of an incident on Halloween 2014 where Defendant ran from to police and officers drew a taser.[21] (*Id.* at 140-42.)

Ms. Nelson testified regarding some background information regarding Defendant. Defendant earned a G.E.D while in custody. (*Id.* at 139-40.) Defendant and Ms. Nelson grew up with Mr. Echols and are well-acquainted with him. (*Id.* at 153-54.)

She was also aware that Mr. Echols has an A1 tattoo. (*Id.* at 154.) She knows A1 as a musical group and not a gang. (*Id.*) Additional facts will be discussed as necessary.

## III.   DISCUSSION

### A.   *The Parties' Positions*

Defendant argues that officers did not have reasonable suspicion that he was armed and dangerous on June 28, 2020 and therefore he should not have been searched. Defendant asserts that officers relied too much on his single conviction as a reason for his search and argues that he did not make any furtive movements or engage in any other

---

[20] Ms. Nelson's testimony was not founded on education, training, or experience in law enforcement. Rather, she seemed to be offering her opinion as an ordinary citizen.
[21] There was no affirmative evidence in the record of Defendant fleeing from the police on Halloween 2014 and being confronted by police with a taser, only Ms. Nelson's denial that she was aware of it.

suspicious behavior that night. Defendant also argues that the evidence does not establish that he voluntarily consented to a *Terry* pat-down. Therefore, the firearm seized during the pat search must be suppressed.

The Government responds that officers had reasonable suspicion that Defendant was armed and dangerous based on the totality of the circumstances. The Government also contends that Defendant gave implied consent to be searched based on the characteristics identified in *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990). (Doc. 59 at 1-4.) In addition, the Government asserts that Defendant's background and teaching from his father to comply with law enforcement is irrelevant to the analysis and that Defendant did not submit to an overwhelming police presence on June 28, 2020. (*Id.* at 4.)

## B.    *Whether Officers Had Reasonable Suspicion that Defendant was Armed and Dangerous*

Defendant does not appear to dispute that officers were entitled to ask the occupants of the Cadillac to exit the vehicle. Indeed, in *United States v. Maryland*, the Supreme Court recognized that officers may do so:

> . . . [D]anger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car. While there is not the same basis for ordering the passengers out of the car as there is ordering the driver out, the additional intrusion on the passenger is minimal. We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.

519 U.S. 408, 414-15 (1997). Here, there was even more reason to do so because officers had probable cause to search the Cadillac for open containers of alcohol based on the presence of the open bottle of Patrón officers had already found. In addition, both Detectives Ehlers and Northrup were concerned by the safety issues presented by having multiple passengers in the vehicle. However, while law enforcement may lawfully order passengers to exit a vehicle pending completion of a traffic stop, "[t]o justify a pat down

of . . . a passenger during a traffic stop . . . the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

"Officers may conduct a protective pat-down search for weapons . . . when they have objectively reasonable suspicion that a person with whom they are dealing 'might be armed and presently dangerous and criminal activity might be afoot.'" *United States v. Robinson*, 664 F.3d 701, 704 (8th Cir. 2011) (quoting *United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir. 2000)). Officers need not be certain that someone is armed and dangerous; rather, the question is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Roggeman*, 279 F.3d 573, 578 (8th Cir. 2002) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1967)). The reasonable suspicion necessary "'is dependent on both the content of information possessed by police and its degree of reliability.'" *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Reasonable suspicion is judged by the totality of the circumstances. *United States v. Jones*, 606 F.3d 964, 966 (8th Cir. 2010).

"[O]fficers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'" *United States v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). "The level of suspicion necessary to constitute reasonable suspicion that will, in turn, justify a protective pat-down search 'is considerably less than proof of wrongdoing by a preponderance of the evidence' and 'is obviously less demanding than that for probable cause.'" *Roggeman*, 279 F.3d at 578 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). However, there must be some minimal objective justification. *Id.* A "mere hunch does not amount to reasonable suspicion." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Reasonable suspicion, can, however,

be based on the collective knowledge of all the officers involved in an investigation. *See United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008) ("The collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers.").

When it is obvious that suspects are associated with each other, it is proper for the behavior of the entire group to be considered, not just the behavior of one member in isolation. *United States v. Dupree*, 202 F.3d 1046, 1049 (8th Cir. 2000) (discussing the principle in relation to a stop); *United States v. Menard*, 95 F.3d 9, 11 (8th Cir. 1996) (recognizing that an officer could take into consideration that one companion was armed when deciding whether to frisk the other companion because they "did not just happen to be together in a public place"; noting that the relationship between people in the same car together is different from the relationship between tavern patrons). In addition, "[t]he Supreme Court has frequently noted the inherent danger traffic stops pose to police officers and the consequent likelihood that minimally intrusive weapons searches will be reasonable." *Menard*, 95 F.3d at 11.

Some factors to consider in making the reasonable suspicion decision include: "the area of the incident, the behavior of the individuals at the scene, and [the defendant's] own behavior," *United States v. Hightower*, 716 F.3d 1117, 1120 (8th Cir. 2013); the officer's knowledge of the defendant's gang and other criminal affiliations, the defendant's attempts to avoid interaction with police upon seeing the police, *see United States v. Cornelius*, 391 F.3d 965, 967 (8th Cir. 2004); safety warnings that the defendant is known to carry weapons, *see United States v. Walker*, 104 F.3d 364 (8th Cir. 1996); and prior criminal history, *see United States v. Moore*, 795 F.3d 1224, 1230 (10th Cir. 2015). Courts must not look at factors in isolation and attempt to evaluate

22

their individual weight. *Hightower*, 716 F.3d at 1121. Rather, under the totality of the circumstances, Courts must look at all the factors in relation to each other, some of which might have more weight in any given case. *Id.*

In its Resistance, the Government listed factors gleaned from case law that support the conclusion that officers had reasonable suspicion that Defendant was armed and dangerous on June 28, 2020. That list provides a helpful structure for my analysis and encompasses

> Factors supporting this conclusion include but are not limited to the following: (1) the cautionary information available to police that defendant carries weapons and resists arrest; (2) defendant's prior federal conviction for a weapons offense; (3) defendant's prior participation in, or presence at, incidents resulting in police investigations where firearms were present or discharged; (4) defendant's affiliation with a Waterloo street gang known to law enforcement to be involved with weapons, shootings, and narcotics; (5) the location of the traffic encounter in an area of the city that routinely involved criminal behavior including incidents involving firearms; (6) the location of the traffic encounter being approximately one block away from Flirts's parking lot where just prior there was a report of an African-American male in the parking lot waving around an AR-15 and that suspect not being present when police arrived at Flirts (Gov. Exh. 3); (7) defendant's apparent change in demeanor when VCAT officers arrived on scene; (8) what appeared to be nervous behavior of all three occupants of the vehicle, with Echols who was on federal supervision for a weapons offense, [Echols][22] delaying his departure from the vehicle, and defendant appearing to look around; (9) Keller's furtive gestures to the floorboard area of the rear passenger seat such that an officer told him not to reach under the seat; (10) the response from Echols and the occupants who had just been the victims of a collision ostensibly not wanting any police assistance with that matter; (11) the open alcohol in the vehicle leading to the conclusion that the police might be dealing with unpredictable, intoxicated individuals; (12) the fact that the traffic encounter occurred late at night lending to the officers being less able to fully evaluate the scene

---

[22] The Government's brief said "Keller," which I believe was a typographical error. The Government does not argue that Mr. Keller delayed his exit from the vehicle, but does argue that Mr. Echols tried to delay, indeed avoid, exiting the Cadillac.

and surrounding area (Gov. Exh. 6); and (13) the fact that police were involved with a multi-suspect traffic encounter, which is known to be a potentially dangerous situation for law enforcement officers (as stated in *Maryland v. Wilson*, 519 U.S. at 414-15).

(Doc. 38 at 11-14 (citations omitted).)

### 1. *Warning Information*

In the instant case, Detectives Ehlers and Northrup testified regarding warning information stating that Defendant carries weapons and resists arrest. *See United States v. Menard*, 898 F. Supp. 1317, 1323 (N.D. Iowa 1995), *aff'd*, 95 F.3d 9 (8th Cir. 1996) (holding that safety report that defendant might be armed with a pistol "justified the minimal intrusion of a pat-down search for weapons."), *aff'd sub nom. United States v. Walker*, 104 F.3d 364 (8th Cir. 1996); *United States v. Green*, 946 F.3d 433, 439 (8th Cir. 2019) (in addition to other information, Waterloo police properly relied on intelligence that a suspect was seen in possession of a weapon in a Facebook video). Although the original dates of the warnings are not known, it is certainly a factor law enforcement could use in formulating their suspicion of the danger posed by Defendant.

### 2. *Gang Affiliation*

Detectives Ehlers and Northrup also knew Defendant was associated with A1/Front Street, a Waterloo street gang that was known to be involved with weapons, shootings, and narcotics. Defendant argues that the most recent evidence Detective Northrup cited as evidence of his gang affiliation was a YouTube music video. (Doc. 58 at 18.) Ms. Nelson testified that A1/Front Street is a music group and not a street gang. (*Id.*) Defendant asserts that the Detectives' testimony about "hybrid" gangs is "nonsensical" and that the very idea of a hybrid gang is antithetical to the nature of street gangs. (*Id.* (citing link to "Jet Song" from *West Side Story*).) Defendant asks that the Court find the evidence relating Defendant's gang membership ambiguous or insufficient to create reasonable suspicion. (*Id.* (citing *United States v. Hammond*, 890 F.3d 901,

906-07 (10th Cir. 2018) ("Standing alone, a criminal record—let alone arrests or suspected gang affiliation—is not sufficient to create reasonable suspicion of anything."); *United States v. Roelandt*, 827 F.3d 749 (8th Cir. 2016) (finding gang association relevant because defendant was a known gang member and his gang was involved in a recent shooting)).) He also asserts that he was not wearing gang colors or clothing and did not behave in a manner suggesting affiliation with a particular street gang. (Doc. 30-2 at 3 (citation omitted).)

First, I decline to find that Detective Ehlers's and Detective Northrup's testimony regarding the hybrid nature of A1/Front Street was "non-sensical." The term has previously been used by a police officer in at least one other case in this Court and by at least one of its sister courts. *See United States v. McKenzie*, No. 18-CR-1043-CJW, 2018 WL 6651530, at *4 (N.D. Iowa Dec. 19, 2018) (noting that officer testified that "it is appropriate to search juveniles because they tend to be carrying firearms and may be part of hybrid gangs"), *R. & R. adopted*, No. 18-CR-1043-CJW-MAR, 2019 WL 503105 (N.D. Iowa Feb. 7, 2019); *United States v. Wright*, No. 02-00116-03-CR-WFJG, 2006 WL 2587471, at *1 (W.D. Mo. Aug. 29, 2006) ("Kansas City Street Gangs, unlike LA Street Gangs, are hybrids, occasionally showing interaction between Bloods and Crips").

Second, rather than find the evidence on this issue ambiguous, I conclude that officers could reasonably believe A1/Front Street to be a criminal gang. They may also create music and post it on YouTube.

Third, while Defendant is correct that membership in a gang, alone, is not sufficient to create reasonable suspicion, it is one factor the Court may consider when evaluating the totality of the circumstances. *See Cornelius*, 391 F.3d at 967 (gang affiliation is a factor that is properly considered). I note that while Detective Ehlers testified that both Defendant and Mr. Echols were members of A1/First Street, Detective

Northrup testified that Mr. Echols was a member of the gang and that Defendant was an "associate with the A1/Front Street." (Northrup Hr'g Test. at 96.) However, Detective Northrup first testified that Mr. Echols was "associated" with A1/ Front Street and then clarified that he was a "member." (*Id.* at 95-96.) Thus, it is unclear whether Detective Northrup meant to state that he thought Defendant was a "member" or an "associate." For current purposes, I find it is a distinction without a difference because Detectives Ehlers and Northrup testified that Defendant was involved in the same types of activities as Mr. Echols. More importantly, as this Court opined in *United States v. Matlock*,

> . . . .[C]ases have recognized mere gang "affiliation" is a consideration that law enforcement officers may consider in determining whether reasonable suspicion exists. *See United States v. Cornelius*, 391 F.3d 965, 967 (8th Cir. 2004); *see also United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir. 1995) ("Knowledge of gang association and recent relevant criminal conduct, while of doubtful *evidentiary* value in view of the strictures against proving guilt by association or by a predisposition based on past criminal acts, is a permissible component of the articulable suspicion required for [an investigatory] stop."). Moreover, the court views the distinction between being a gang member and associating with gang members to be an exercise in semantics in this instance—regardless of whether Defendant was in fact a gang member, his ties to gang members were apparently close and exclusive enough that Officer Wilson knew him to associate with members of one specific gang in the Waterloo area. *See* Transcript at 5. Defendant does not dispute that he does, in fact, associate with such persons, and Officer Wilson's knowledge of Defendant's ties to such persons, supports reasonable suspicion.

2017 WL 508586, at *5 (N.D. Iowa Feb. 7, 2017). Evidence supports a finding that Defendant was a member of A1/Front Street or at the very least affiliated with the gang. This was a factor officers on the scene could properly consider when evaluating reasonable suspicion. *Cornelius*, 391 F.3d at 967.

### 3. Area Known for Weapons Violations and Time of Night

This encounter occurred in what Deputy Ehlers described as a "high crime" area of Waterloo at night where police officers have seen "multiple" weapons violations, including individuals brandishing firearms and shooting firearms. (Det. Ehlers Hr'g Test. at 54.) Defendant counters this description of the site, stating that the encounter occurred in a "commercial" area of the city rather than in a "high crime" area of the city. (Doc. 30-2 at 3 (citing *Sero v. City of Waterloo*, No. C08-2028, 2009 WL 2475066, at *7 (N.D. Iowa Aug. 11, 2009) (officer stated that a high crime area was characterized by "robberies, burglaries, thefts, we have a lot of gun violence or weapon violations in the area, assaults").) Defendant also argues that the Court should not consider the area high crime because Detective Northrup could not "qualify 'high crime' or recount when the most recent homicide or penultimate weapon violation in the area had occurred." (Doc. 58 at 17-18 (citing *United States v. Montero-Camargo*, 208 F.3d 1122, 1139, n.32 (9th Cir. 2000) (en banc) (finding that "courts should examine with care the specific data underlying any such assertion."); *United States v. Weaver*, 9 F.4th 129 (2nd Cir. 2021) (Lohier, J. concurring) (writing that "a defendant's presence in a so-called 'high-crime area' has limited relevance in determining the reasonableness of a search; indeed, the whole concept of a 'high-crime area' is now so ill-defined as to be virtually meaningless.").)

The Eighth Circuit does not require the Court to make a specific finding that an area is a "high crime area." *United States v. Hightower* declined to adopt a requirement that a court find an area "high crime," and instead allowed the court to rely on evidence that the area "had been the scene of . . . [relevant] criminal activity." 716 F.3d 1117, 1120 & n.4 (8th Cir. 2013); *see also United States v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005) (explaining that a "neighborhood marked by frequent crimes involving firearms" is a relevant factor). It appears that the problem identified in the cases cited

by Defendant is avoided in cases like *Hightower* and *Bailey* when the Government presents evidence that certain types of crime have occurred in the relevant area, rather than just using the short-hand term "high crime area." To that end, *Montero-Camargo* stated, "The citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." 208 F.3d at 1138. Here, the designation is factually based. Deputy Ehlers described the area around Flirts as "a high-crime area when it comes to major assaults and multiple weapons violations. Those weapon violations involve subjects brandishing firearms and also subjects shooting firearms." (Det. Ehlers Hr'g Test. at 54.) Although Detective Ehlers did not testify regarding the specific block where the accident occurred, Flirts is only one to two blocks away from the accident site. (Det. Northrup Hr'g Test. at 98.) Detective Northrup described the area of the accident as one having "multiple weapons violations." (*Id.* at 99.) Moreover, although Detective Northrup could not recall the most recent homicide that occurred in the downtown area or the most recent weapons violation that occurred in the downtown area prior to the one that had occurred at Flirts two minutes before he arrived at the accident because there are multiple shifts and he is not apprised every time an officer is dispatched, as discussed above, he indicated that weapons violations are rather routine in the area. It is therefore appropriate for the Court to consider that this incident occurred in an area known for gun violence. In addition, although there were streetlights, Detective Northrup described the lighting at the scene as "dim." (*Id.*; Gov. Ex. 6.) Officers could consider the time of night along with the nature of the neighborhood when assessing whether they had reasonable suspicion to pat search the occupants of the Cadillac. *United States v. Stewart*, 631 F.3d 453, 457-458 (8th Cir. 2011) (finding the late night hour of encounter was properly considered factor even though multiple officers were present).

28

#### 4.    *Proximity to Weapons Violation at Flirts*

Relatedly, the traffic encounter occurred approximately one block away from Flirts, where there was a report of a Black man outside the club waving around an AR-15, and the suspect was not present when police arrived at Flirts.   (Gov. Ex. 3.) Defendant urges the Court to find the incident at Flirts irrelevant because the suspect in that incident fled in a black SUV, which is clearly not a white Cadillac and there was no description of the suspect other than race and gender.  (Doc. 58 at 17.)  Defendant asserts that although it may be "tempting" to consider this incident under the totality of the circumstances, it is not even a "circumstance" because it does not constitute a material fact or meaningful condition.  (*Id.*)  While Defendant is correct that this may not be a material fact relating to Defendant, it does explain why Detectives Ehlers and Northrup were in the area and thought it prudent to respond to the call when they heard that Mr. Echols and Defendant were nearby.  As discussed above, it is also one more piece of evidence indicating the nature of some of the gun crimes that occur in the area.  Thus, while this fact will be considered in the totality of the circumstances, I agree with Defendant that it is not a fact that should be given much weight.

#### 5.    *Actions and Demeanor of Other Occupants of the Cadillac*

Officers on the scene were allowed to consider the behavior of other occupants of the Cadillac besides Defendant when determining if there was reasonable suspicion to search Defendant.  *Dupree*, 202 F.3d at 1049; *Menard*, 95 F.3d at 11.   The three occupants of the Cadillac "did not just happen to be together in a public place."  *Id.*  Mr. Echols and Defendant, specifically, grew up together as neighbors and are "God brothers and sisters."  (Nelson Hr'g Test. at 153.)  Detective Ehlers testified that Mr. Echols's demeanor changed from lighthearted to nervous when he saw the VACT detectives coming and that his face took on a "worried" or "concerned" look.  (Det. Ehlers's Hr'g Test. at 57-58.)  He also testified that Mr. Echols's denial that there was any damage to

the Cadillac and attempt to hand him the Patrón bottle appeared to be attempts to avoid contact with law enforcement, a search of the Cadillac, or his exit from the Cadillac. (*Id.* at 59-60, 62.) Officer A. Ehlers also testified that Mr. Echols's denial that an accident ever occurred was unusual because most people who are in accidents want the police to help them find the person who damaged their car. (A. Ehlers Hr'g Test. at 11-12.) In addition, Detective Northrup was concerned because of Mr. Keller's repeated furtive "digging around" on the floorboard area of the backseat to the point that an officer had to yell at him not "reach[] under the seat!" The officers were allowed to consider the behavior they observed. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *United States v. Cotton*, 782 F.3d 392, 396 (8th Cir. 2015) (holding that "the evasive behavior of [an] apparent companion" and "location in a violent area" created a "reasonable suspicion that criminal activity was afoot."); *United States v. Woodall*, 938 F.2d 834, 837 (8th Cir. 1991) (explaining that an officer's knowledge that a vehicle's occupant leaning down to the floorboard is a movement typically made by people carrying weapons or contraband is a factor that contributed to the officer's reasonable suspicion defendant was carrying a weapon); *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995) (noting that reasonable suspicion is determined based on "the parties' behavior when they become aware of the officer's presence.") (citing *Losee v. Dearinger,* 911 F.2d 48 (8th Cir. 1990)).

### 6.    *Actions and Demeanor of Defendant*

The Government also argues that officers could consider Defendant's apparent change in demeanor when VCAT officers arrived on scene and that he appeared to look around when Detective Ehlers was speaking to Mr. Echols, all in the context of the nervous behavior of the other occupants of the vehicle, which will be discussed below. Defendant admits that Detectives Ehlers and Northrup testified he was looking around

30

"because he was nervous." (Doc. 58 at 16.) However, he asserts that he only looked around after officers positioned themselves in his blind spot. Furthermore, Defendant notes that Officer A. Ehlers testified that she did not observe Defendant make any furtive movements, attempt to hide his hands, or move his hands toward his waistband. (*Id.*) In addition, Defendant states that he was not looking around "in a nervous manner" and that Detective Northrup's body camera video shows him acting "calm and nonchalant as he flips through a book and his phone. Detective Northup even goes so far as to tell the Defendant, 'you're good man,' as he shined his flashlight onto the Defendant in the vehicle." (*Id.* (citing Gov. Ex. 2 at 1:49:46.).) Defendant also states that Detective Northrup testified that Defendant did not reach for his waistband, attempt to hide his hands, or fidget (other than when he looked around to see where the other officers were standing). Therefore, Defendant argues that "nervousness is of limited significance in determining reasonable suspicion" and that his nervousness is mitigated by the rest of his conduct and demeanor, Detective Northrup's statement that he was "good," and law enforcement's "unclean hands." (*Id.* (quoting *United States v. Ludwig*, 641 F3d 1243, 1249-50 (10th Cir. 2011).)

I find there is some evidence to support the statement that Defendant's demeanor changed when VCAT officers arrived on scene. At the hearing, Detective Ehlers was asked if he noticed anything about the demeanor of the "occupants" of the Cadillac as he approached. (Det. Ehlers Hr'g Test. at 57.) He answered that as he approached, it appeared that everyone was "lighthearted or even possibly laughing inside the vehicle." (*Id.*) However, "Mr. Echols then looked up and saw [Detective Ehlers] approaching the vehicle, and he became—he became very nervous. When I say 'nervous,' the look on his face changed from lighthearted to a worried or very concerned look on his face." (*Id.* at 57-58.) That is the only testimony in the record regarding change in demeanor of an

occupant when VCAT officers arrived. However, the rest of the video evidence indicates that Defendant no longer seemed light-hearted after VCAT arrived on scene.

As Defendant admits, he looked around "at almost a 180" at one point. (Def. Ex. 2 at 1:49:31-43.) Both detectives stated under oath that in their training and experience, this behavior is consistent with someone looking for an escape route or making a decision about whether to flee. (Det. Ehlers Hr'g Test. at 59-60; Northrup Hr'g Test. at 102.) While Defendant states he was only looking to see who was in his blind spot, I cannot ignore the testimony of two detectives who testified based on their years of training and experience. *Roberts*, 787 F.3d at 1209. This behavior certainly justified trained officers in keeping a close eye on Defendant during their investigation and justified Detective Northrup's close proximity to the car even if the dark window tint, itself, was not enough justification. Moreover, while Defendant's looking around was not as overtly suspicious as Mr. Echols's evasiveness or Mr. Keller's furtive movements, it is but one more piece of evidence officers on the scene had to consider in light of their training and experience, and it is also a legitimate factor for the Court to consider when making determining whether there was reasonable suspicion to search Defendant. *See Hightower*, 716 F.3d at 1121 ("from the officers' perspective," it appeared that defendant attempted to flee, which "create[ed] reasonable suspicion to support a *Terry* stop."); *United States v. Oliver*, 550 F.3d 734, 738 (acknowledging danger of allowing passenger of stopped vehicle to depart without a pat-down and then being able to turn around and shoot the officer); *Roberts*, 787 F.3d at 1209 (noting officers must assess reasonable suspicion in light of their training and experience).

The Eighth Circuit addressed this issue recently. *See United States v. Stewart*, ---4th---, 2022 WL 1250962, at *2 (8th Cir. April 28, 2022). *Stewart* held that although video footage did not confirm a trooper's testimony concerning traffic violations he stated the defendant committed, "nothing in the video evidence undermine[d] the testimony."

*Id.* (citations omitted). Therefore, the video evidence "neither confirm[ed] nor refut[ed] the trooper's assertions. *Id.* Because credibility determinations are left to the trial court, the decision of the district court was affirmed. *Id.* (noting that "[c]redibility assessments are 'the province of the trial court,'" and that a "credibility determination made by a district court after a hearing on the merits of a motion to suppress is virtually unassailable on appeal.") (quoting *United States v. Harper*, 787 F.3d 910, 914 (8th Cir. 2015) (quoting *United States v. Heath,* 58 F.3d 1271, 1275 (8th Cir. 1995); *United States v. Morris*, 915 F.3d 552, 555 (8th Cir. 2019) (quoting *United States v. Frencher*, 503 F.3d 701, 701 (8th Cir. 2007))). Here, the video evidence also does not confirm or refute Detectives Northrup and Ehlers's testimony regarding the actions and demeanor of Defendant and his companions. Thus, I note here again that I found all testimony presented at the hearing credible.

Defendant makes much of Detective Northrup's statement, "You're good, man," seeming to go so far as to argue that this statement is at odds with any finding that Defendant exhibited nervousness or other related behavior. (Doc. 58 at 16.) However, that statement was not a blanket announcement that Defendant was free from any suspicion or no longer needed to be watched by Detective Northrup. Detective Northrup said, "You're good, man," in response to Defendant pointing to something on the floor of the Cadillac. (Gov. Ex. 2 at 1:49:45-49.) It is unclear what Defendant was pointing at, but Detective Northrup's statement was clearly a response to that gesture, not a proclamation about the overall situation in the vehicle. After he said it, Detective Northrup continued to watch Defendant and Mr. Keller with his flashlight.

### 7. *Evidence Related to Defendant's Criminal History*

The record also contains information related to Defendant's 2015 federal conviction for a weapons offense. Indeed, that offense is the predicate offense upon which his current indictment is based. (Doc. 2.) Defendant argues that "mere knowledge

of [his] criminal history does not give rise to reasonable suspicion that [he] was armed and dangerous." (Doc. 30-2 at 3 (citing *Arizona v. Johnson*, 555 U.S. 323, 327 (2009); *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010)).) He asserts that a several-year-old conviction does not add "much of anything to the totality of the circumstances." (Doc. 58 at 19 (citing *United States v. Stachowiak*, 521 F.3d 852, 856 (8th Cir. 2008) (finding information was not stale and was relevant to whether defendant was armed and dangerous because information was from an incident a week prior and was regarding the "ongoing nature of [the defendant's] armed drug trafficking").) Defendant also notes that when asked about "a couple of incidents from 2017," Detective Ehlers was unable to identify any of the persons who discharged firearms in a shooting incident that occurred at his sister's home and that the only evidence Detective Ehlers could recall regarding whether Defendant lived at the home where the incident took place was that at some point it was brought up that Defendant lived there "at some point." (*Id.*) In the second 2017 incident, Defendant's family's home was shot up, which Defendant rightfully points out makes him the victim. (*Id.*) Defendant asserts that the incident is "wholly irrelevant" because the idea that he has been "biding his time for 3 and a half years before hatching his scheme to exact revenge on the people who shot up his family's home is preposterous." (*Id.* at 19-20.) Defendant admits that in a September 2018 incident, he was one of several occupants of a vehicle from which a firearm was thrown. (*Id.* at 20.) DNA samples were taken from multiple individuals in an attempt to determine who threw the firearm. (*Id.*) Although Defendant was one of the people who supplied a DNA sample, the results were not back on June 28, 2020, although Detective Ehlers did eventually know that the results showed that Defendant's DNA was on the firearm and he was charged in that case. (*Id.*; Det. Ehlers Hr'g Test. at 53-54.) The only thing Detective Northrup knew about this incident in 2020 was that Defendant was a suspect in a 2018 shooting. (Doc. 58 at 20; Det. Northrup Hr'g Test. at 111.)

34

I agree with Defendant that the 2017 and 2018 incidents discussed during the suppression hearing add little to the evaluation of reasonable suspicion in this case, except that that officers knew that a home Defendant was known to reside at was shot at twice in 2017 and he was a suspect in gun case in 2018, but there was no evidence against him as of 2020. However, they also knew about his prior conviction for a gun crime that was only five-years-old and were allowed to consider that in conjunction with all the other evidence facing them that morning, especially since Defendant was apparently still in the same town he had been in his whole life and in an area of that town that was known for gun violence. *See United States v. Scott*, 818 F.3d 424, 431 (8th Cir. 2016) (concluding 12- and 4-year-old convictions were not too remote in time to consider in determining reasonable suspicion).

### 8.     *Open Bottle of Alcohol*

Finally, the officers on scene knew immediately that they were dealing with at least one open bottle of alcohol because they smelled it. This led them to believe they might be dealing with "unpredictable" individuals. In addition, on a traffic stop, multiple people in a car presents a greater safety concern than just one person. *Wilson*, 519 U.S. at 414-15. While Defendant argues that an open bottle of alcohol in the backseat of the car "does nothing to suggest that the front seat passenger in a vehicle in a minor accident is armed and dangerous" (Doc. 58 at 16), officers are allowed to rely on their training and experience when they make reasonable suspicion determinations. *Roberts*, 787 F.3d at 1209. Here, although the occupants of the vehicle did not appear intoxicated in the body camera videos after officers initially spoke with them—at least the front seat passengers—officers did not know that when they arrived on scene. In addition, as the previous discussion makes clear, alcohol was but one factor officers had to think about when dealing with this group of people.

### 9.    Conclusion

Based on the totality of the circumstances, I find that officers had reasonable suspicion that Defendant was armed and dangerous.   "[P]rior criminal history is by itself insufficient to create reasonable suspicion. . . . However, when viewed in conjunction with other factors that suggest criminal activity may be occurring, criminal history can be a powerful contributor to the reasonable suspicion analysis." *United States v. Moore*, 795 F.3d 1224, 1230 (10th Cir. 2015) (bracket in original) (quoting *United States v. Santos*, 403 F.3d 1120, 1130-31 (10th Cir. 2005)).   Here, Detectives knew that Defendant had a "carries weapons" warning attached to his name, that he had a previous conviction for a firearms crime, and that he was associated with the A1/Front Street gang that is known to be involved with weapons, shootings, and narcotics.   He was in an area of Waterloo known for weapons crimes at 1:30 a.m. with Mr. Echols who also had a similar warning attached to his name; was on federal supervised release for a firearms charge; was a member of A1/Front Street; had been the subject of firearms investigations conducted by Detective Ehlers; and seemed determined to avoid interacting with law enforcement or to leave the Cadillac, which is contrary to the way people normally act when their cars are involved in accidents.   This behavior, alone, was suspicious.   In addition, Mr. Keller kept "digging" on the floorboard of the backseat and had to be warned not to do so more than once by WPD officers.   *See Menard*, 95 F.3d at 11 (recognizing that officer can take into account the suspicious behavior of fellow occupants of vehicle).   The car smelled of alcohol and one open bottle of alcohol was visible through Mr. Echols's open window, but the time of night and the heavy window tint on the other windows limited officers' ability to see into the car.   Although this evidence did not make finding a weapon a certainty, it was enough to make a "reasonably prudent man in the circumstances . . . [believe] that his safety or that of others was in danger." *Roggeman*, 279 F.3d at 578.

This case is somewhat analogous to *United States v. Green*, in which the Eighth Circuit affirmed this Court's conclusion that an officer had reasonable suspicion to pat search a passenger in a vehicle that had been stopped for a speeding and registration violations. 946 F.3d 433, 436 (8th Cir. 2019). The officer noticed the defendant making "suspicious movements" right before he stopped the vehicle. *Id.* Once he stopped the vehicle, the officer smelled marijuana and recognized that the defendant was the subject of an intelligence report that indicated he had possessed a weapon in a Facebook video. *Id.* at 1039. The court found that "[g]iven the presence of illegal narcotics, [the officer] could have suspected that drugs were being transported in the car," which justified the search because a belief that someone is involved in a drug transaction "supports a reasonable belief that the person may be armed and dangerous because weapons and violence are frequently associated with drug transactions." *Id.* (quotation omitted).

In the instant case, unlike the marijuana smell in *Green*, the drugs in the driver's side door were not found early enough to justify the searches of Defendant and Mr. Keller. However, as the previous discussion shows, there is other evidence in this case that was not present in *Green*.

Accordingly, I find that there was reasonable suspicion to search Defendant on June 28, 2020.

## C. Whether Defendant Consented to the Pat Search

### 1. Defendant's Arguments

Defendant argues that he did not consent to the pat search of his person. Defendant argues that there is "no reason to believe [Detective Ehlers's search of Mr. Echols] escaped Defendant's attention," especially because Detective Ehlers advised Mr. Echols that he intended to pat search him "mere feet from where Defendant sat." (Doc. 58 at 12.) Defendant also asserts that Defendant was "immediately mimicking the actions of [Mr.] Keller . . . when the Defendant turn[ed] around and raise[d] his arms. (*Id.* at 13

37

(citing Gov. Ex. 1A at 1:52:00).)  He further argues that his freedom of movement was restrained to such an extent when he stepped out of the Cadillac that he was not free to leave, which is an important factor in determining whether he "was in custody and by extension whether consent was freely given."  (*Id.* at 13-14 (citing *United States v. Flores-Sandoval*, 474 F.3d 1142, 1146-1147 (8th Cir. 2007)).)  Relatedly, Defendant avers that a reasonable officer would believe that he "submitted to law enforcement's overwhelming show of force during an otherwise routine accident investigation" and was not voluntarily consenting to be searched.  (Doc. 48 at 3.)  Defendant argues that the arrival of "the VCAT *team*" on the scene of a minor motor vehicle accident that was not a felony stop in response to a shooting or a robbery reasonably justified any nervousness he and the other occupants of the Cadillac exhibited. (*Id.* (emphasis in original).) According to Defendant, prior to the arrival of VCAT, he and his co-occupants were "decidedly relaxed." (*Id.*)  Any nervousness they showed after the arrival of VCAT was nothing more than "a reasonable person's response to a situation suddenly transforming form an ordinary accident investigation into something else entirely" and therefore, any Government argument based on their "changed demeanor" once VCAT arrived is without merit because law enforcement created the situation that caused such a demeanor change among the occupants of the Cadillac.  (*Id.*)

Defendant also argues that "it is at least colorable that his traits and experiences are not irrelevant to the Court's determination regarding the voluntariness of his consent."  (*Id.* at 4.)  Defendant notes that "[n]umerous studies and polls show that minority groups have a negative perception of police officers" and that the relationship between minority groups and law enforcement is one of mistrust.  (*Id.* (citing William J. Stuntz, *Race, Class, and Drugs*, 98 Colum. L. Rev. 1795, 1797 & n.6 (1998)); Associated Press, *Reno Urges Officers to Try to Regain Trust*, Balt. Sun, April 16,1999 at 7A.)  He also states that while Black Hawk County, the county in which Waterloo sits,

38

is Iowa's most racially diverse county, the ratio of African Americans in the county population to African Americans in the county jail is disproportionate. (*Id.* at 5-6.) According to Defendant, African Americans comprise 9.7% of the county population and 51% of the Black Hawk County Jail population. (*Id.* (citing https://wcfcourier.com/news/ local/govt-and-politics/black-hawk-county-groups-work-to-address-racial-disparities-in-criminal-justice-system/article_d21ffcc0-fbda-5a47-91fd-a846c26e30fb.html).) Thus, Defendant argues that based on Ms. Nelson's testimony regarding his education about, and experience with, law enforcement, the totality of the circumstances "do not support a finding that any consent was voluntary. Rather, . . . [his] actions were not the product of 'free and unrestrained choice,' but the result of historical and present coercion, his actions were involuntary." (Doc. 58 at 14-15.)

The Government responds that a reasonable officer in Detective Northrup's position would interpret Defendant's actions as "demonstrating a voluntary, willingness to be frisked" because he neither expressed nor displayed any reluctance to being frisked nor asked any questions, but instead just "assum[ed] the position without being asked." (Doc. 38 at 8 (citing *United States v. Martin*, 982 F.2d 1236, 1238-39 (8th Cir. 1993) (finding pat-down consensual based on suspect's willing submission to the pat-down even though the suspect questioned the reason for the pat search and was told that it is routine practice). The Government also asserts that although Ms. Nelson testified that Defendant was taught to comply with law enforcement, this history has no bearing on whether a reasonable officer would believe Defendant was consenting to be searched. (Doc. 59 at 4 (citing *United States v. Rodriguez*, 834 F.3d 937, 940 (8th Cir. 2016)).) The Government also argues that the evidence does not support that Defendant submitted to an "overwhelming show of force." (*Id.*) Rather, the Government asserts that the evidence shows that Officer Northrup asked, "Nelson, would you step out, man?" in a "calm, pleasant tone" and Defendant responded by "plainly and voluntarily" extending

implied consent to a pat-down by Detective Northrup. (*Id.* (citing Gov. Ex. 2 at 1:51:25).)[23]

### 2. Analysis

Whether consent was voluntary is based on the totality of the circumstances. *United States v. Chaidez,* 906 F.2d 377, 380 (8th Cir. 1990). The Government has the burden to show Defendant voluntarily consented to the search by a preponderance of the evidence. *Id.* "Voluntary consent may be express or implied." *Rodriguez*, 834 F.3d at 940 (quoting *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006)). "Consent can be inferred from words, gestures, and other conduct." *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001) (citing, *inter alia*, *United States v. Mendoza–Cepeda,* 250 F.3d 626, 627 (8th Cir. 2001)) ("consent to touch midsection expressed by suspect raising arms in response to request"). Even defendants who give officers mixed messages regarding consent can provide valid consent. *See United States v. Mendoza*, 677 F.3d 822, 826, 829 (8th Cir. 2012) (defendant's consent to search valid although he did not verbally consent to a search of his house and refused to sign the consent-to-search form, but did not object when officers informed him they were going to search his house and

---

[23] The Government also notes that contrary to Ms. Nelson's testimony, Defendant was an individual known to resist arrest, was previously pursued on foot and fled from law enforcement, and received disciplinary sanctions for refusing to obey an order when in the custody of the Bureau of Prisons ("BOP"). (*Id.* (citing 14-cr-2053, Docs. 79-1).) The cited document is the presentence investigation report in the prior prosecution of Defendant in this Court. I am extraordinarily reluctant to rely on a presentence investigation report in a prior case to establish facts in the case at bar. In this case, the Government did not offer the report into evidence or request the Court take judicial notice of it. Thus, Defendant did not have an opportunity to assert objections to consideration of the report in the context of the instant motion. The report shows Defendant raised at least one objection to the report. *Id.* at ¶ 5. I have no way of determining (without reviewing the transcript of Defendant's sentencing hearing) whether that objection was resolved or how it was resolved. I decline to consider items from a prior prosecution that were not admitted into evidence or subjected to judicial notice at the suppression hearing. Thus, this evidence has not been considered.

he gestured in the direction of the house "in a way that indicated consent"). "[T]he ultimate inquiry is not whether the defendant subjectively consented, but whether 'a reasonable officer would believe consent was given.'" *Rodriguez*, 834 F.3d at 940 (quoting *United States v. Pena–Ponce*, 588 F.3d 579, 584 (8th Cir. 2009)).

The parties agree that *Chaidez* lists the relevant "characteristics of persons giving consent" and of "the environment in which consent was given." 906 F.2d at 381. The following characteristics of the person are relevant when assessing the voluntariness of his consent:

> (1) Their age;
> (2) Their general intelligence and education;
> (3) Whether they were intoxicated or under the influence of drugs when consenting;
> (4) Whether they consented after being informed of their right to withhold consent . . . ; and
> (5) Whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*Id.* (cleaned up). "In examining the environment in which consent was given, courts should ask whether the person who consented:"

> (1) Was detained and questioned for a long or short time;
> (2) Was threatened, physically intimidated, or punished by the police;
> (3) Relied upon promises or misrepresentations made by the police;
> (4) Was in custody or under arrest when consent was given;
> (5) Was in a public or secluded place; or
> (6) Either objected to the search or stood by silently while the search occurred.

*Id.* (cleaned up and renumbered).

Defendant was born in 1995 and was 25-years-old at the time of the search. (Doc. 59 at 2 (citation omitted).) Defendant received his G.E.D. and completed "several

educational courses" while in the custody of the BOP (Nelson Hr'g Test. at 139-40.) [24] Defendant has held several jobs in the Waterloo area. (Ms. Nelson Hr'g Test. at 139, 148.) Defendant does not appear to have any mental or emotional health issues. (Doc. 79-1 ¶ 40.) Defendant admits that the record does not support finding that he was under the influence of alcohol. (Doc. 58 at 15.) The entire incident took approximately 20 minutes and occurred on a public street with some streetlights, albeit in the middle of the night, during which time, no one was threatened, physically intimidated, or punished by the police. In addition, Defendant did not rely on promises or misrepresentations made by the police. Defendant also did not object to the search, but complied before even being asked to comply. These factors all weigh in favor of voluntary consent. The other factors require more discussion and, to a certain extent, overlap a bit.

Defendant was not told he had the right to withhold consent to be searched. However, I find that had he asked not to be searched, his request would have been denied because Detective Northrup testified that Defendant was "not going to exit and then leave the area of the well of the front passenger side door without being frisked. . . ." for weapons.[25] (Northrup Hr'g Test. at 120.) However, that finding, alone, does not end the inquiry. During a *Terry* stop, officers may check for weapons and may take any additional steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). In doing so, they must "employ the least intrusive means of detention and

---

[24] The Government also cites 14-cr-2053, Docket 79 at 1 in support of this and other purported facts its reply brief. For the reasons set forth in footnote 23, I decline to consider the information from the presentence investigation report.

[25] This testimony was in the form of a question and answer, not a single statement. (Northrup Hr'g Test at 120.)

investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop." *Id.* (citing *Florida v. Royer,* 460 U.S. 491, 500 (1983)).

Here, officers knew that Defendant had warnings for carrying weapons and resisting arrest,[26] a previous firearm conviction, and was associated with A1/Front Street. They also knew that Mr. Echols was on "probation" for a federal firearms conviction, had been investigated by the WPD for weapons violations, and was a member of A1/Front Street. Despite Ms. Nelson's testimony that A1/Front Street was a musical group, law enforcement knew A1/Front Street to be a gang that was responsible for drug distribution and weapons-related offenses, including shootings. Therefore, even though it is reasonable to assume that VCAT officers determined shortly after their arrival that none of the occupants of the Cadillac were associated with the incident at Flirts, it was also reasonable for officers to "protect their personal safety and to maintain the status quo" by conducting quick pat searches of the occupants of the Cadillac before they searched the vehicle for more open alcohol containers. *Id.* Detectives Ehlers and Northrup were concerned that occupants of the Cadillac could be carrying weapons. (Det. Ehlers Hr'g Test. at 63; Northrup Hr'g Test. at 108.) Although this factor may not weigh in favor of consent, as discussed above, officers would have been justified in overriding a refusal to provide consent. In addition, as will be discussed below, Defendant is familiar with the legal system, searches, and seizures.

Defendant was not in custody or under arrest, but was temporarily seized while officers investigated the open bottle incident. (A. Ehlers Hr'g Test. at 31-32.) "For purposes of the Fourth Amendment, a person is seized when officers restrain a person's liberty through physical force or a show of authority." *United States v. Jones*, 990 F.2d 405, 408 (8th Cir. 1993). Officer Northrup testified that had defendant tried to leave the

---

[26] Only Detective Northrup was familiar with the resisting arrest warning. (Det. Ehlers Hr'g Test. at 50; Northrup Hr'g Test. at 97.

scene, he would have been stopped so that Officer Northrup could perform a pat-down search for "officer safety." (Northrup Hr'g Test. at 119-20.)[27] Thus, Defendant asserts that "while [he] was seized pursuant to an open alcohol/accident investigation, Officer [A.] Ehlers had no information to seize him for being armed and dangerous, as she had no such information." (Doc. 58 at 3.) He also notes that Officer A. Ehlers did not observe him make any furtive movements, attempt to hide his hands, or move his hands toward his waistband. (*Id.* (citing A. Ehlers Hr'g Test. at 32-33).) Officer A. Ehlers testified that in a typical open container case, all occupants are removed from the vehicle and the vehicle is searched for more open containers. (A. Ehlers Hr'g Test. at 13.) Detective Ehlers removed Mr. Echols so the Cadillac could be searched for open containers. (Det. Ehlers Hr'g Test. at 60.) However, Detective Ehlers was concerned for the safety of himself and officers on the scene because he thought the occupants of the Cadillac could be carrying weapons. (*Id.* at 63.) He performed a pat search of Mr. Echols. Likewise, Detective Northrup pat searched Defendant to determine if he was armed for "officer safety for [himself] and others." (Northrup Hr'g Test. at 119-20.) As discussed above, officers have the right to take the reasonable step to search passengers during a *Terry* stop to maintain the status quo. *Navarrete-Barron*, 192 F.3d at 790. A pat search is a "minimally intrusive" when compared to the dangers officers face during a traffic stop. *Menard*, 95 F.3d at 11, *see also United States v. Cunningham*, No. CR16-3007, 2016 WL 1532248, at *6 (N.D. Iowa Apr. 15, 2016), *R. & R.*

[27] Defendant asserts, "Whether an individual possesses freedom of movement is an important factor to be considered in determining whether they are in custody and by extension whether consent was freely given." (Doc. 58 at 14) (citing *United States v. Flores-Sandoval*, 474 F.3d 1142, 1146-1147 (8th Cir. 2007)). Defendant is correct. However, there are other reasons people may temporarily not be free to leave a scene at will that does not involve police custody, such as being detained for a short time while police pursue an on-site investigation and gather facts. *See Wilson*, 519 U.S. at 414-15 (officers may order people out of the vehicle *pending completion* of a traffic stop).

*adopted*, No. CR16-3007-LTS, 2016 WL 2869782 (N.D. Iowa May 17, 2016). Detectives Ehlers and Northrup had reason to pat search the occupants given what they knew of Mr. Echols's and Defendant's warnings and history of gun crimes. Pat searches were the least restrictive method of insuring the safety of everyone on the scene when faced with people who obviously did not want to deal with law enforcement at that moment and who were known for carrying guns in the community. *See Navarrete Barron*, 192 F.3d at 790. Thus, the two types of incidents, a traffic accident versus a gun crime, are not mutually exclusive: the initial incident being investigated need not be a gun crime for officers to conduct a pat search of the occupants of a vehicle. *See United States v. Smith*, 990 F.3d 607, 610 (8th Cir. 2021) (vehicle registration violation and fleeing police); *Waters v. Madson*, 921 F.3d 725, 732 (8th Cir. 2019) (shoplifting); *United States v. Nanos*, 209 F. App'x 604, 605 (8th Cir. 2006) (investigatory traffic stop based on tip from store employee that vehicle occupants purchased precursors to methamphetamine).

While Defendant is correct that there were several WPD officers and detectives on scene, that does not mean they had to run the risk that occupants of a vehicle, two of whom were known to carry weapons and at least one who was known to flee law enforcement, were armed. Fourth Amendment reasonableness does not require "that a policeman must feel 'scared' by the threat of danger." *United States v. Menard*, 95 F.3d 9, 11 (8th Cir. 1996) (quoting *United States v. Tharpe*, 536 F.2d 1098, 1101 (5th Cir. 1876)). Moreover, Officer A. Ehlers found it unusual that Mr. Echols did not want to talk to officers about his accident. This behavior also contributed to Detective Ehlers's suspicion that occupants of the Cadillac wanted to "bypass interaction with law enforcement." (Det. Ehlers Hr'g Test. at 59.) Detective Ehlers testified that he thought Mr. Echols handed him the Patrón bottle in an attempt to appease officers and avoid a search of his vehicle and the discovery of other open containers or other illegal

contraband.  (*Id.* at 60.)  Detective Ehlers described the attempt as "almost providing . . . a decoy."  (*Id.*)  To the extent Defendant may be asserting that he might not have been searched had Detectives Ehlers and Northrup not arrived on scene, that is mere speculation and not based on the facts before the Court.

Thus, while Defendant was not under arrest or in custody, he was seized during this incident.  However, he had the use of his cell phone up until he was arrested.  Although Defendant makes much of how close Detective Northrup stood to the Cadillac, the vehicle's tinted windows and Defendant's refusal to lower the window more than a few inches made that necessary as much as anything else.  Detective Northrup said the only way he could see into the car was to hold his flashlight close to the windows because of the excessive window tint.  (Northrup Hr'g Test. at 101.)  Although the evidence related to this factor is mixed, on the whole, it weighs in favor of consent.  Defendant was not isolated or overpowered in any way.  Detective Northrup, alone, dealt with Defendant.  Defendant was never "double-teamed," threatened, handled roughly, or even spoken to in anything other than a calm casual tone.

Defendant had been interacting with law enforcement since he was a child and had previously been arrested and convicted.  Detective Ehlers testified that Defendant had been arrested "a minimum of five times," which did not include parole, probation, and supervised release violations.  Defendant was, therefore, aware of the protections afforded to suspected criminals by the legal system.

However, Defendant argues that his early interactions with law enforcement and his father's life-long instruction to comply with law enforcement because the risks of not complying are too great result in resignation and his submitting to the inevitable, which can be misconstrued as consent.  (Doc. 48 at 2.)  Defendant asserts that he was merely doing what he believed was expected in this situation, especially after watching Mr. Echols be searched by a member of VCAT.

46

First, I find Defendant's argument that he was affected by the search of Mr. Echols without merit. Although it is not very clear due to the dark tint on the vehicle window and the glare from Detective Northrup's flashlight, Detective Northrup's body camera video appears to show Mr. Echols exit the Cadillac beginning at 1:51:21 a.m. (Gov. Ex. 2 at 1:51:21.) Defendant appears to be looking at Mr. Echols as he exits. At 1:51:23 a.m., the officer watching Mr. Keller tells Mr. Keller, "Don't be reaching under the seat! Don't be reaching under the seat!" Defendant turns his head in response to this command and tries to see what is happening in the backseat. At 1:51:26 a.m., Detective Northrup asks Defendant to step out of the car and Mr. Echols puts his hands in the air while facing Detective Ehlers. (*Id.* at 1:51:26.) Defendant immediately complied. (*Id.* at 1:51:27.) Thus, Defendant did not clearly see Detective Ehlers pat search Mr. Echols because it appears that Detective Ehlers had not even conducted the pat search by the time Defendant exited the Cadillac. Detective Ehlers's body camera video supports this conclusion. It shows Defendant exiting the Cadillac as Detective Ehlers is finishing his pat search of Mr. Echols. (Def. Ex. 2 at 1:51:33.) Prior to exiting, it appears Defendant was looking at his phone, not at Mr. Echols. (*Id.* at 1:51:31-32.) Therefore, the video evidence does not support Defendant's argument that he saw Mr. Echols get searched before he exited the Cadillac.

Second, the evidence does not support his argument that he mimicked Mr. Keller when he raised his arms to be searched. Defendant exited the Cadillac and immediately turned his back to Detective Northrup and raised his hands. Although Officer A. Ehlers's body camera video shows Mr. Keller looking at Defendant while he prepares to be searched, the video does not show Defendant returning the glance. (Gov. Ex. 1A at 1:52:07-08.) Detective Northrup's body camera video does not show Defendant looking anywhere when he exits the Cadillac, only turning and raising his arms. (Gov. Ex. 2 at 1:51:30-33.) Thus, while Defendant may have been aware that Mr. Keller was searched,

the argument that Defendant was somehow mimicking Mr. Keller's actions is not supported by the video evidence. In fact, it appears that Defendant and Mr. Keller were searched at approximately the same time. It is even possible that Defendant had his hands up before Mr. Keller did since he put his hands up immediately upon exiting the Cadillac and it appears Mr. Keller did not put his hands up until he received instruction to do so.

Third, while it is true that VCAT does not normally respond to motor vehicle accidents, I find nothing troubling about Detectives Ehlers and Northrup responding to this particular accident because it was in close proximity to their crime scene and because it was reasonable to assume that someone fleeing their crime scene could have caused an accident a block or two away. Video evidence shows that once the detectives arrived on scene, while they certainly took over the investigation, they did not appear to openly "pull rank" on the other officers at the scene or to bully or be belligerent with the occupants of the Cadillac. In fact, Detective Ehlers's tone was accurately described as "calm, friendly, joking around." (Det. Ehlers's Hr'g Test. at 83.) To the extent Defendant argues that the presence of VCAT detectives changed the tone or tenor of the stop, I disagree. As discussed, all officers were friendly and casual. The only time anyone raised a voice was when a WPD officer, not a VCAT officer, admonished Mr. Keller, "Don't be reaching under the seat! Don't be reaching under the seat!" (Gov. Ex. 2 at 1:51:23.) The VCAT detectives were dressed more casually than the WPD officers. While it appears that all the officers carried guns, handcuffs, and the full complement of items one would expect of an officer on duty, the WPD officers were in full uniform with the items attached to their belts and the VCAT detectives wore khakis and t-shirts with the items in vests. Contrary to Defendant's argument, I do not find that the tone of the stop changed when the VCAT officers arrived on scene, other than adding two more members of law enforcement to the total number of people at the scene.

48

On the other hand, Defendant's history and education suggest a propensity to comply with law enforcement regardless of the legitimacy of their demands on him. They were taught to "fear what may happen" anytime they are in contact with the police. (Nelson Hr'g Test. at 128.) Moreover, it is entirely plausible that an African American man in 2020 would behave in concert with those teachings and would show compliance, even if he was not voluntarily consenting. To Defendant, it was a foregone conclusion that he would be searched, so he resigned himself to the search and assumed the search position, rather than consent to the search. However, the question becomes whether a reasonable officer in the position of Detective Northrup would have interpreted Defendant's actions as consent because, legally, Defendant's subjective intent is not part of the inquiry. *Rodriguez*, 834 F.3d at 940.

The facts of the case at bar are similar to several cases in which the Eighth Circuit has found voluntary consent. For example in *United States v. Mendoza-Cepeda*, the Eighth Circuit held that officers could have reasonably believed that the defendant consented to a search of his midsection when he raised his arms in response to being asked if law enforcement could search his torso. 250 F.3d 626, 627, 629 (8th Cir. 2001). Likewise, when an officer asked the defendant for permission to search his person in *United States v. Richardson*, and the defendant turned and faced the officer without comment with "his arms up," the Eighth Circuit held the defendant voluntarily consented to be searched. 275 F. App'x 571, 572 (8th Cir. 2008). Similarly, when a defendant raised his arms parallel to the ground after being asked if he consented to be searched, the searching officer had "a reasonable basis to believe [the defendant] was consenting to the search, consistent with his cooperative response and demeanor during the traffic stop and reinforced by his willingness to place his hand on his vehicle's trunk, making access easier, and then retrieving the pipe from his pocket when [the officer] asked what it was." *United States v. Espinoza*, 885 F.3d 516, 524 (8th Cir. 2018); *see also United*

*States v. Jones*, 254 F.3d 692, 694 (8th Cir. 2001) (defendant's holding "arms out away from his body about ten to eighteen inches from his midsection, with his palms turned out," evidenced consent to search). *Espinoza* found it relevant that "it is easy for a person to respond with negative behavior to a request for consent to a pat-down search, for example, by folding one's arms to prevent the search," and that the defendant in that case did not do so. 885 F.3d at 524.

The Eighth Circuit has even found consent when a defendant "did not entirely resist [an] [officer's] requests to move his feet further apart" while conducting a pat search for officer safety prior to giving two high school students a ride home, which indicates some resistance. *See United States v. Lozano*, 916 F.3d 726, 728 (8th Cir. 2019). In *Lozano*, officers were called to an apartment complex at 1:18 a.m. on a suspicious activity call of "two black males walking around." *Id.* Officers encountered defendant and his friend, determined they were not engaging in illegal activity, and offered the boys[28] a ride to the defendant's apartment. *Id.* The officer said he could only give them a ride if he patted them down first and they consented. *Id.* The officer found a gun in the groin area of the defendant's pants. *Id.* The defendant consented to the search because

> [The defendant] willingly lifted his arms to permit [the officer] to perform the pat-down. He did not entirely resist [the officer's] requests to move his feet further apart. [The defendant] never indicated, verbally or nonverbally, a desire to walk away from [the officer]. [The defendant] presented no evidence demonstrating his consent to the pat-down was coerced or made under duress.

*Id.* at 730. However, when a defendant first indicated consent by raising his arms "to facilitate a search of his person," but repeatedly moved his hands down to prevent

---

[28] The defendant's friend was 17. *Lozano*, 916 F.3d at 728. Although the defendant attended high school with his friend, there was no evidence regarding his age. *Id.* n.1. The Eighth Circuit reasoned that determination of the defendant's age was not necessary to resolve the narrow issue before the court. *Id.* at 728 n.1.

a search of his pockets, he unequivocally withdrew his original consent. *United States v. Sanders*, 424 F.3d 768, 775 (8th Cir. 2005).

Based on the totality of the circumstances, Defendant voluntarily consented to the search. Like the defendants in the cases cited above, Defendant signaled consent by raising his arms and turning around. He did not even wait to be asked for consent. Like the defendants in *Jones* and *Lozano*, Defendant expressed no opposition to the search. 269 F.3d at 925; 269 F.3d at 930. Unlike the defendant in *Sanders*, Defendant did not withdraw his consent to search by any word or action. 424 F.3d at 775. In fact, Defendant acted more like the defendant in *Espinoza* when he assisted officers to retrieve the gun from his pants (Gov. Ex. 2 at 1:52:47-1:53:36) in the same way as the *Espinoza* defendant leaned against a car to make the search easier and then retrieved a contraband pipe from his pocket for officers when they asked what it was. 885 F.3d 516, 524. In reaching this decision, I do not downplay Defendant's history with law enforcement that began with his being wrongly accused of shoplifting when he was less than ten-years-old. However, "[w]hether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual." *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) (quoting *United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998)).[29] Here, Detective Northrup could have reasonably interpreted Defendant's actions as consent

---

[29] This case can be distinguished from *United States v. Jerez*, 108 F.3d 684, 691-95 (7th Cir. 1997), in which, in Defendant's words,

> [O]fficers knocked on a motel room door for three minutes, identified themselves as officers, asked the occupants to open the door, knocked on the window for one-and-a-half to two minutes, and shined a flashlight into the window, the subsequent opening of the door by the defendant was a submission to a show of authority within the meaning of the Fourth Amendment.

Based on the above discussion, I find that Detective Northrup could reasonably have believed that Defendant voluntarily consented to be searched on June 28, 2020.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **DENY** Defendant's Motion to Suppress. **(Doc. 30.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 3rd day of May, 2022.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

---

(Doc. 58 at 13.) Nothing officers did in this case was that aggressive, despite Defendant's apparent attempt to paint Detective Northrup's placement so close to the Cadillac as similar. (*Id.* at 13-14.) In addition, the defendants in *Jerez* had heightened expectations of privacy in their motel room, especially in the middle of the night when they were sleeping, that Defendant did not have in Mr. Echols's vehicle. 108 F.3d at 690-91. Furthermore, although Defendant makes much of Detective Northrup's testimony that Defendant was not free to go because he intended to search him for officer safety, that was reasonable for the reasons discussed in this Report and Recommendation. In *Jerez*, officers had no reasonable suspicion that the defendants were even engaged in criminal activity. 108 F.3d at 693-95.